**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George SCHNABEL,**
**Defendant–Appellant.**

No. 89–5609.

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1990.

Decided July 11, 1991.

Stanley James Reed, argued (Susan Berry Blomfield, on brief) Lerch, Early, Roseman & Frankel, Chartered, Bethesda, Md., for defendant-appellant.

Dale Preston Kelberman, Asst. U.S. Atty., argued (Breckinridge L. Willcox, U.S. Atty. and Jane F. Barrett, Asst. U.S. Atty., on brief), Baltimore, Md., for plaintiff-appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and SMITH, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

## OPINION

EDWARD S. SMITH, Senior Circuit Judge:

The appellant, George J. Schnabel II (Schnabel), was convicted of mail fraud in the United States District Court for the District of Maryland. On appeal, Schnabel asserts five instances of abuse of discretion by the trial court. We find no abuse of discretion by the trial court, and we affirm.

1. (1988).

*Facts*

Schnabel was indicted on March 3, 1988 on three counts of mail fraud in violation of 18 U.S.C. § 1341,[1] and conspiracy to commit mail fraud in violation of 18 U.S.C. § 371.[2] The conspiracy charge was later dismissed on the Government's motion after Schnabel's alleged co-conspirators entered guilty pleas. After six days of trial before a jury, Schnabel was convicted of all three counts of mail fraud on March 14, 1989. Schnabel's conviction arises from events surrounding the collapse of First American Mortgage Company, Inc. (FAMCO). Specifically, Schnabel was convicted of inducing the Fairway Spring Company (Fairway Spring) to invest approximately $1.5 million in FAMCO, and subsequently using the mails to perpetrate fraud on Fairway Spring which led to the loss of its investment. Schnabel appeals his conviction.

FAMCO was engaged in originating mortgages and "selling" them to investors in the form of interest bearing notes secured by specific mortgages. Evidence showed that FAMCO suffered cash flow problems and engaged in fraudulent activities to alleviate its financial difficulties. Some of these fraudulent activities included diversion and commingling of investors' funds, sales of individual mortgages to multiple investors, and misrepresentation of security and insurance provisions supposedly backing FAMCO notes. For example, when a borrower paid off a loan, instead of remitting the principal to the investor who "owned" the loan, the funds were commingled with FAMCO's and used to make interest payments to other investors.

Schnabel first became involved with FAMCO as a financial planner with Financial Services Group (FSG) selling FAMCO loans to investors. The two companies later combined to form a joint venture, and Schnabel later became a vice-president of FAMCO. In September, 1983, while still employed by FSG, Schnabel first persuaded Fairway Spring to invest almost $500,000

2. (1988).

of its funds in FAMCO notes under representation that the notes were secured by mortgages and insured. After Schnabel had moved from FSG to FAMCO, he continued to service the Fairway Spring account and persuaded Fairway Spring to invest an additional $1,055,000, bringing its total investment in FAMCO to approximately $1,555,000.

In September, 1984, Hennie Chase, FAMCO's treasurer, and Tim Hastings, manager of FAM Servicing (FAMCO's wholly owned servicing subsidiary), were called into a meeting with Jerry Gaultney, FAMCO's president, and Schnabel. Gaultney told Chase and Hastings that Fairway Spring had agreed to become an unsecured creditor of FAMCO, and to sell the mortgages which had been assigned to secure Fairway Spring's investment. Evidence shows that Fairway Spring had agreed to no such thing.

One consequence of this meeting was that confusion developed between Chase and Hastings as to who was responsible for Fairway Spring's interest payments. As a result, Fairway Spring received no interest payments from September, 1984 through February, 1985. When Fairway Spring called Schnabel to complain, he told them that he would take care of the problem immediately and reassured them of the safety of their investment. Schnabel then went to Hastings and directed him to remit payment to Fairway Spring for the amount of interest owed them for the four missing payments. Hastings sent Fairway Spring a check for $91,000 via Federal Express, and thereafter sent them their monthly interest payments by regular mail until FAMCO closed its doors in November, 1985.

Schnabel stayed in regular contact with Fairway Spring and repeatedly assured it of the safety of its investment. The combination of Schnabel's reassurances, and the regular interest checks, lulled Fairway Spring into a false sense of security about its investment until the day FAMCO folded and it found out that its investment was unsecured and the whole $1.5 million was lost.

*Issues*

On appeal, Schnabel alleges error by the trial court on four issues:

I. That the trial court abused its discretion by refusing defendant's request for supplemental voir dire.

II. That the trial court committed prejudicial error by admitting evidence of Schnabel's previous tax returns and the testimony of Schnabel's secretary concerning her family's investments with him.

III. That the trial court erred by failing to grant Schnabel's motion for acquittal based on variance between the evidence and the indictment.

IV. That the trial court's "willful blindness" instruction was not supported by the evidence.

*Refusal of Voir Dire*

During the court's initial voir dire, the jury was asked if any of them had served on a petit jury at the trial of a state or federal criminal case, and if so, whether such service had influenced them in any way. No jurors responded. Between the first and second day of trial, defense counsel discovered that the jurors had been on jury duty for four weeks prior to trial. This led him to believe that the jury had not accurately responded to the court's inquiry.

Schnabel filed a motion to obtain juror information, asking specifically whether any juror had served on a petit jury before the trial court during its current term, and if so, which attorneys had prosecuted those cases. During a chambers conference on the motion, the court stated that only one juror "falls into the category in question". Schnabel requested that the court conduct a limited voir dire of the juror concerning her prior jury experience. The court denied Schnabel's request, but instead offered to replace the juror with an alternate. Schnabel declined the offer, and trial continued with the juror still empaneled.

Schnabel asserts that the trial court's failure to conduct the requested voir dire was an abuse of discretion because it de-

nied him information needed to make an informed decision on whether to strike the suspect juror. We disagree.

"A district court has wide discretion in the conduct of *voir dire.*"[3] The purpose of voir dire is to obtain a fair and impartial jury.[4] Therefore, the question is whether the trial court's ruling impaired Schnabel's ability to obtain a fair and impartial jury, and if so, was the impairment significant enough to constitute an abuse of discretion.

In his brief to this Court, Schnabel admits that any doubt of the impartiality of the juror in question was based on speculation. The trial court was under no obligation to conduct supplementary voir dire based on mere conjecture.[5] Schnabel relies on three cases to support his contention that failure to conduct supplemental voir dire of a "questionable" juror constitutes abuse of discretion.[6] These three cases share a common fact pattern which makes them distinguishable from the case at bar. All three deal with jurors who are incapacitated due to *physical illness.* The issue dealt with in these cases pertains to a juror's physical ability to continue to hear the case, and has nothing to do with juror bias whatsoever.

Schnabel also admits to the impossibility of showing that he was prejudiced by the trial court's refusal to grant supplementary voir dire. Indeed, even if the trial court had granted his request and the juror had proved unsatisfactory to him, the proper remedy would have been to replace the juror, which the trial court offered to do.[7] Any prejudicial effect of the trial court's refusal to grant voir dire of the suspect juror was rendered harmless by its offer to replace her.

Schnabel's argument that he was "forced" to decide whether to replace the juror without "adequate information" is contradicted by the record. The first question posed by Schnabel's motion to obtain juror information was whether any juror had served on a petit jury trying a criminal case before the trial court during the current term. The record shows that the trial court answered this question at a meeting in chambers by categorizing one juror as "falling within the category in question". The second question posed by Schnabel's motion pertained to which attorneys prosecuted the cases referred to in the first question. This second question was directly asked and answered in the negative during the trial court's original voir dire. Therefore, Schnabel had all the information that he had requested, and was not prejudiced in any way by the trial court's offer to replace the suspect juror.

In sum, we hold that the trial court did not abuse its discretion by denying Schnabel's request for supplemental voir dire on a suspect juror and instead offering to replace the juror with an alternate.

### Admission of Tax Returns and Secretary's Testimony

■ During its case-in-chief, the government introduced into evidence Schnabel's tax returns for the years 1984 and 1985, and testimony of his secretary (Ms. Minor) that Schnabel forgave a commission on the sale of FAMCO mortgages to her parents. Schnabel asserts that the trial court erred

---

**3.** *Person v. Miller,* 854 F.2d 656, 665 (4th Cir. 1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989); *United States v. Griley,* 814 F.2d 967, 974 (4th Cir.1987).

**4.** U.S. Const. amend. VI.

**5.** *Neron v. Tierney,* 841 F.2d 1197, 1202 n. 6 (1st Cir.) ("Allegations [of bias] which are frivolous—that is, entirely conclusory or conjectural, contradicted by the record ... or obviously inconsequential—do not trigger any duty of inquiry and do not require that a hearing be held."), *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *see also United States v. Click,* 807 F.2d 847, 850 (9th Cir.1987) (no abuse of discretion in refusing *voir dire* question that was based only on speculation).

**6.** *United States v. Doerr,* 886 F.2d 944 (7th Cir. 1989); *Green v. Zant,* 715 F.2d 551 (11th Cir. 1983); *United States v. Fajardo,* 787 F.2d 1523 (11th Cir.1986).

**7.** *United States v. Thompson,* 744 F.2d 1065, 1068 (4th Cir.1984) ("[A]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."); Fed.R.Crim.P. 24(c).

by improperly admitting this evidence over his objections on grounds of relevancy. Because the relevancy of evidence admitted at trial is within the discretion of the trial court,[8] a reversal will be considered only if there has been an abuse of this discretion.[9] We find no such abuse.

To prove fraud the government has to prove that Schnabel acted with specific intent to deceive. The Government contends that the tax returns and testimony were offered to prove motive. Evidence of motive indicates a likelihood of specific intent. Schnabel's use of the mails to forward Fairway Spring's interest checks did not result in benefits accruing directly to him. However, lulling Fairway Spring into a false sense of security concerning its investment in FAMCO did benefit Schnabel indirectly because he was earning substantial income from FAMCO. Withdrawal of Fairway Spring's funds would precipitate an economic death blow to the company resulting in termination of that income. Clearly, the trial court was well within its discretion to admit Schnabel's tax returns for the time he was employed by FAMCO as evidence of his substantial monetary stake in the company's continued operations.

■ Similarly, the testimony of Ms. Minor relating to his forgiveness of his commission on her parent's investment in FAMCO was used to show the level of income Schnabel was receiving from FAMCO; he was making so much money that he could afford to forego commissions on small investments. Again, these facts tend to show the financial stake that Schnabel had in FAMCO.

■ Schnabel argues in the alternative that, even if the evidence was relevant, its relevancy is far outweighed by its prejudicial effect under Fed.R.Evid. 403. With respect to the tax return, Schnabel is not only unable to identify how admission of

his tax return "prejudiced" him, he admits that the jury could easily have drawn the *opposite* conclusion from this evidence; that his success provided a disincentive to commit fraud. Therefore, his allegation of the prejudicial effect regarding admission of his tax returns is groundless.

■ Schnabel argues that Ms. Minor's testimony was prejudicial to him because: (1) it raised the inference that he defrauded her family, and (2) it was an improper admission of "other crimes" not falling under the exception presented by Fed.R.Evid. 404(b). As the government correctly points out in its brief, the decision to exclude evidence because of possible prejudicial effect rests in the sound discretion of the trial court.[10] Schnabel admits that neither Ms. Minor's testimony, nor any other evidence presented at trial suggested that he knew that the investment was bad when he recommended it. Thus, the evidence does not imply that Schnabel tried to defraud Ms. Minor. Nor is there any evidence in the record to suggest that Schnabel was ever accused of any criminal wrongdoing connected with Ms. Minor's parents investments. The record simply does not support Schnabel's contentions.

### Failure to Grant Acquittal

■ At the close of evidence, Schnabel made an oral Motion for Judgment of Acquittal on the grounds of: (1) an insufficiency of evidence, and (2) that the government's proof was in material variance with the charges in the indictment, or in the alternative, amounted to a constructive amendment to the indictment. Schnabel's motion was denied by the trial court.

On appeal, Schnabel maintains that the trial court abused its discretion by failing to grant his Motion for Acquittal based on the material variance/constructive amendment issue. This argument is without merit.

**8.** *Beaty Shopping Center, Inc. v. Monarch Ins. Co.,* 315 F.2d 467, 471 (4th Cir.1963).

**9.** *Gill v. Rollins Protective Services Co.,* 836 F.2d 194, 198 (4th Cir.1987) (citing *Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192, 1199 (4th

Cir.1982); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 518 (4th Cir.1985).

**10.** *United States v. Masters,* 622 F.2d 83, 87–88 (4th Cir.1980).

The indictment charges that "[f]rom in or about September, 1983, to in or about June, 1984, George Schnabel induced Fairway Spring Company of Horseheads, New York, to invest $1,531,000 in FAMCO mortgages." Schnabel's contention is based on the testimony of a key government witness, Ms. Dorothy Tarby, treasurer for Fairway Spring. Ms. Tarby testified that she believed that she was investing (for Fairway Spring) in *short term notes* secured by mortgages, rather than in mortgages directly. In his brief to this Court, Schnabel asserts fatal variance based on the fact that he could not have induced Ms. Tarby to *purchase mortgages*, as charged in the indictment, when her testimony indicates her understanding that Fairway Spring was receiving *notes*. Schnabel claims that the legal distinction between the two types of obligations caused a fatal variance between the indictment and the evidence.

First, the indictment charges inducement to *invest* in, not buy, FAMCO mortgages. The indictment says nothing about "purchasing". Therefore, Ms. Tarby's understanding that she was investing Fairway Spring's money in FAMCO notes secured by mortgages originated by FAMCO clearly satisfies the terms of the indictment.

Second, the contested language is in a predicate paragraph and therefore is not an element of the offense charged. "In determining whether there has been a variance between pleading and proof, it is the charging paragraphs that are to be examined." [11]

■ Third, as the government correctly points out, any variance which does not result in prejudice to the accused is inconsequential.[12] Prejudice is shown if: (1) The indictment does not fairly appraise the defendant as to the charges, or (2) the defendant is not protected from subsequent prosecutions for the same crime.[13] Schnabel has made no showing, nor do we believe

that he could prove, that he was in any way "surprised" at trial by the charges levied against him. Nor was the indictment of insufficient detail so as to fail to protect him against double jeopardy.

■ We now turn to Schnabel's claim of constructive amendment. Constructive amendment consists of alteration of an indictment by (1) presentation of evidence, and (2) jury instructions both of which work to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.[14] In his brief, Schnabel fails to even mention jury instructions in connection with this issue. If the jury instructions didn't vary from the indictment the indictment could not have been "amended." Schnabel was charged with mail fraud, he defended against mail fraud, and he was convicted of mail fraud. There is just no support for the contention that the substance of the crime charged was in any way dependent upon whether Fairway Spring thought it was "investing in mortgages" or investing in "notes supported by mortgages".

### *Willful Blindness Instruction*

■ Over Schnabel's objection, the trial court granted the government's request for a "willful blindness" jury instruction. To convict Schnabel of fraud, the government had to prove that he acted knowingly and willfully with the specific intent to deceive. The willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him. Schnabel asserts that the trial court committed reversible error because the instruction was improper. A requested instruction may be given if there is a foundation

---

**11.** *United States v. Jordan,* 626 F.2d 928, 931 (D.C.Cir.1980).

**12.** *See United States v. Quicksey,* 525 F.2d 337 (4th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).

**13.** *United States v. Miller,* 471 U.S. 130, 134–35, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985).

**14.** *See United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986); *see also United States v. Holt,* 529 F.2d 981 (4th Cir.1975).

in evidence to support it.[15] At trial, the government introduced evidence of a wide variety of fraudulent practices that took place at the Baltimore office of FAMCO while Schnabel was a vice-president there. This evidence alone could easily support the inference that if Schnabel was unaware of what was happening around him, it was because he deliberately shut his eyes to it. There was also the testimony of Mr. Hastings that Schnabel was present at a meeting in September, 1984 at which the plan to resell the mortgages securing Fairway Spring's investment was discussed.

Schnabel argues that this evidence tends to prove *actual* knowledge rather than a deliberate attempt to evade knowing, thus making a willful blindness instruction inappropriate. He relies on the proposition in *United States v. Perez–Padilla,* which held that a willful blindness instruction is inappropriate if the evidence shows that the defendant had either actual knowledge or no knowledge at all.[16] Schnabel's reliance is misplaced because the rest of the *Perez–Padilla* holding provides that when there is evidence of *both* actual knowledge and deliberate ignorance, as in the case at bar, a willful blindness instruction is appropriate.[17] Therefore, we hold that the trial court did not err by giving the jury a willful blindness instruction.

## Conclusion

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED.

---

**15.** *United States v. Dornhofer,* 859 F.2d 1195, 1199 (4th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989).

**16.** 846 F.2d 1182, 1183 (9th Cir.1988).

